Rachael L. Smiley (State Bar. No. 24066158)
Alex Campbell (State Bar No. 24095536)
Kevin Barnett (State Bar No. 24103834)
**FERGUSON BRASWELL FRASER KUBASTA PC**
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Phone: 972-378-9111
Fax:   972-378-9115
rsmiley@fbfk.law
acampbell@fbfk.law
kbarnett@fbfk.law

**PROPOSED COUNSEL FOR DEBTOR IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re** § § | | **Chapter 11** |
| **LEADING LIFE SENIOR LIVING, INC.,** § § § | | **Case No. 22- 42784-MXM** |
| **Debtor.** § § | | |

**DECLARATION OF JOSEPH V. PEGNIA, DEBTOR'S CHIEF RESTRUCTURING OFFICER IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**

I, Joseph V. Pegnia, declare as follows under the penalty of perjury:

1. My name is Joseph V. Pegnia, and I am over 21 years of age and competent to make this declaration ("**Declaration**").

2. I am the Chief Restructuring Officer ("**CRO**") of Leading Life Senior Living, Inc., a Texas nonprofit corporation (the "**Debtor**"), the debtor in the above-captioned chapter 11 case ("**Bankruptcy Case**"). I have formally served in this capacity since November 10, 2022.

3. I am a Managing Director at GlassRatner Advisory & Capital Group LLC dba B. Riley Advisory Services ("**B. Riley**"). I have over twenty-five years of professional experience in

DECLARATION OF JOSEPH V. PEGNIA
 IN SUPPORT OF FIRST DAY MOTIONS

1

guiding restructuring alternatives, executing turnarounds, facilitating asset sales and otherwise providing financial guidance to companies in distress, and have been involved in over thirty Chapter 11 cases and multi-state Federal Receiverships. My experience crosses various industries, including healthcare, skilled nursing, financial services, and restaurant/hospitality. Some of my notable assignments as a turnaround consultant and/or CRO include the chapter 11 sale of a 600 resident CCRC, sale of a 100-bed skilled nursing facility, and the sale of a $150 million national mail-order pharmacy.

4. I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this case and in support of the Debtor's petition for relief under chapter 11 of the Bankruptcy Code and the pleadings filed by the Debtor on or around the petition date. I have reviewed the factual support set forth in each of the first day pleadings and attest to the accuracy thereof to the best of my knowledge. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with the Debtor's professionals and its board of directors ("**Board**"), my review of relevant documents, or my opinion based on upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. This Declaration has two parts. Part One of this Declaration provides an overview of the Debtor's business, capital structure, and events giving rise to this chapter 11 case and information regarding the Debtor's bankruptcy objectives. Part Two summarizes the relief requested with respect to, and the support for, the Debtor's various first day motions and requests for related interim and final orders.

## PART ONE: OVERVIEW

**I.** **The Debtor, Acquisition of its Facilities, and Events Leading to Bankruptcy**

6. The Debtor is a not-for-profit Texas corporation that owns two memory care facilities (each a "**Facility**" and together, the "**Facilities**") in Oklahoma. The facilities were purchased in 2017 by the Debtor from Edmond Memory Care LLC and Southwest Oklahoma City LLC. The Edmond facility was opened in 2014 and has 42 beds. The Oklahoma City facility was opened in 2015 and has 44 beds.

7. To finance the acquisition of the Facilities, the Debtor issued $30,275,000 in Senior Living Revenue Bonds through the Oklahoma Development Finance Authority in 2017, as follows:

    $14,640,000   Series 2017A-1 Bonds
    $3,240,000     Series 2017A-2 Bonds
    $12,395,000   Second Tier Series 2017B Bonds

8. Concurrent with the purchase of the two facilities, Leading Life entered into a management agreement with TLG Family Management LLC, an affiliated entity of The LaSalle Group, Inc., to manage the Facilities. The LaSalle Group, through either TLG Facility Management or another affiliated entity, J&M Family Management ("**JMFM**"), managed the operations of the two Facilities until the termination of their contract effective April 30, 2022. Effective May 1, 2022, Leading Life entered into a new management agreement with Jasmine Estates of Oklahoma, LLC ("**Jasmine Estates**"). Jasmine Estates continues to be the manager of the two Facilities.

9. Effective April 11, 2022, three new Board members were appointed to replace the board members in place at the time. The new members, collectively, have experience and expertise

in corporate finance, senior living operations and non-profit management. These individuals comprise the Board of directors today.

10. In April 2022, in the waning days of its management contract, without authorization and without consultation with or approval from the Board, JMFM transferred $408,770.17 from the Debtor's bank accounts. My understanding from reviewing the Debtor's books and records and from speaking with the Board of Directors, is that JMFM withdrew these funds because JMFM believed that it was entitled to reimbursement on account of certain expenses. However, JMFM had not, and never did, provide satisfactory evidence of the expenses for which said it was entitled to reimbursement.

11. In addition, based on these discussions, it appears that JMFM applied for and received $549,393.31 in Paycheck Protection Program funds. However, the Debtor has no record that those funds were credited against the payroll expenses for which the funds were intended. It also appears that JMFM applied for and received $1,043,000 in HHS Provider Relief Funds that still require mandatory government reporting to ensure they were used to pursuant to program guidelines.

12. For the month ending September 30, 2022, the last period for which the Debtor has reported results publicly: net loss was $97,589.88 and does not include any interest expense; net operating loss was $ 53,733.88 and days cash on hand was 6.09. It should be noted that under a forbearance agreement still in place, debt service is not currently being paid.

13. As of October 31, 2022, occupancy for the two Facilities, combined, was approximately 80%.

14. As the largest known holder of Series A bonds, Berkeley Alternative Income Fund I, LLC ("**BAIF**") has been actively engaged in supporting the continued viability of the Debtor's

two Facilities. BAIF provided $250,000 as part of a Liquidity Support Agreement to assist with operating expenses of the Facilities. The amounts provided by BAIF are subject to an 8% interest rate, and as of the Petition Date, the amount owed to BAIF pursuant to the Liquidity Support Agreement is $254,500.00. Additionally, as a part of the same Liquidity Support Agreement, the Trustee advanced $150,000 from the Senior Bonds Bond Fund established pursuant to the Indenture to assist with the operating expenses of the Facilities and to help the Company transition to a new manager. The amounts advanced by the Trustee and BAIF were necessary to support the continued viability and of the two Facilities and to protect the interests of the holders of the Series A bonds issued pursuant to the Indenture.

15. In addition, the Board and BAIF entered into a non-disclosure agreement/access to non-public information agreement ("**NDA**") on June 24, 2022, under which BAIF has been provided access to financial and operating data for the Debtor's Facilities. The NDA was originally to terminate on August 24, 2022, but was extended by the Debtor and BAIF to November 24, 2022. Under the NDA, BAIF was, and remains, prohibited from trading in the Debtor's bonds.

16. More recently, the Board and BAIF have engaged in conversations about a Chapter 11 bankruptcy with BAIF serving as the Debtor in Possession (DIP) lender to support necessary operational expenses during and through such a bankruptcy. BAIF has also indicated to the Board that as part of the bankruptcy, it will submit a stalking horse bid to purchase the Debtor's two Facilities.

**II.     Debtor's Prepetition Capital Structure**

17. The Debtor is obligated to UMB Bank, N.A., solely in its capacity as trustee ("**Bond Trustee**") under the Indenture (as defined below) for the benefit of the beneficial holders of the Bonds (as defined below) authorized and issued by the Oklahoma Development Finance

Authority (the "**Issuer**"), pursuant to that certain Trust Indenture, dated as of December 1, 2017 (as amended or supplemented from time to time, the "**Indenture**") by and between the Issuer and the Bond Trustee.

18. Pursuant to the Indenture, Issuer issued $30,275,000 aggregate principal amount of Revenue Bonds consisting of: (i) $14,640,000 Senior Living Revenue Bonds (Leading Life Senior Living, Inc. – Autumn Leaves Project) Series 2017A-1 (the "**Series 2017A-1 Bonds**"); (ii) $3,240,000 Senior Living Revenue Bonds (Leading Life Senior Living, Inc. – Autumn Leaves Project) Taxable Series 2017A-2 (the "**Series 2017A-2 Bonds**" and together with the Series 2017A-1 Bonds, the "**Senior Bonds**"); and (iii) $12,395,000 Senior Living Revenue Bonds (Leading Life Senior Living, Inc. – Autumn Leaves Project) Second Tier Series 2017B (the "**Second Tier Bonds**" and together with the Senior Bonds, the "**Bonds**").

19. The proceeds of the Bonds were loaned to the Debtor by the Issuer pursuant to that certain Loan Agreement dated as of December 1, 2017 among the Issuer, the Bond Trustee, and the Debtor, as borrower, (as amended or supplemented from time to time, the "**Loan Agreement,**" and together with the other documents executed in connection with the Bonds, the "**Bond Documents**") in connection with financing the acquisition of two Facilities.

20. As of November 17, 2022 the amounts due and owing by Debtor with respect to the Bonds and the obligations under the Bond Documents are as follows (collectively, the "**Bond Claim**"): (i) the outstanding principal of the Bonds in the amount of $29,680,000.00; (ii) accrued and unpaid interest on the Bonds, as of the Petition Date, in the amount of $3,249,156.13; and (iii) unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date, which such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claim.

DECLARATION OF JOSEPH V. PEGNIA
IN SUPPORT OF FIRST DAY MOTIONS

6

21. In addition, as of as of November 17, 2022, the Bond Trustee is owed an additional $254,500, in connection with funds advanced to the Bond Trustee by Berkeley Capital Partners, LLC, or its designee Berkeley Alternative Income Fund I, LLC, as participating bondholder, under a Liquidity Support Facility and Backstop Reimbursement Agreement, dated as of April 6, 2022, and as amended by that certain First Amendment to the Liquidity Support Facility and Backstop Reimbursement Agreement, dated as of November 2, 2022 (as amended, the **"Liquidity Support Facility"**), to provide additional liquidity support to the Debtor. Amounts due on the Liquidity Support Facility continue to accrue interest.

22. As security for the Bonds, the Debtor granted to the Bond Trustee (a) a security interest in the Facilities, pursuant to two "Mortgage with Power of Sale and Security Agreements" and corresponding fixture filings and UCC financing statements, which granted the Bond Trustee a security interest in each Facility, together with the improvements constructed thereon, including all buildings, structures and improvements thereon, and all fixtures, machinery, equipment, furniture, furnishings and other personal property attached to, located in, or used in connection with any such structures, buildings or improvements, and all additions, substitutions and replacements thereto and (b) granted a security interest in all cash operating and non-operating revenues of the Facilities (as limited by the definition of "Project Revenues" in the Indenture) (collectively, the "**Collateral**"), which liens are valid, properly perfected and fully enforceable security interests in the Collateral.

23. As further security for the Bonds and to perfect the security interest granted to the Bond Trustee in "Project Revenues," the Debtor, the Bond Trustee, and The American National Bank of Texas ("**Bank**") entered into a Deposit Account Control Agreement dated April 12, 2022 (the "**DACA**"), whereby, among other things, Debtor granted the Bond Trustee a security interest

in the deposit accounts ("**Deposit Accounts**") at the Bank as identified in the DACA, which is fully enforceable by its terms.

24. On May 2, 2022, the Bond Trustee and the Debtor entered into a Forbearance Agreement ("**Forbearance Agreement**") whereby the Bond Trustee agreed to forbear from exercising its rights and remedies under the Bond Documents, including commencing foreclosure proceedings of the Facilities and exercising exclusive control over the Deposit Accounts subject to the DACA, in exchange for the Debtor and its board of directors agreeing to transition the management of the Facilities to a new manager, maintain certain restrictions on distributions, strict adherence to an interim budget, and other, further assurances to enable the Bond Trustee to exercise or enforce its rights under the Bond Documents. On November 2, 2022, the Bond Trustee and the Debtor further extended the outside termination date of the Forbearance Agreement by 30 days, until December 2, 2022.

## PART TWO: TESTIMONY IN SUPPORT OF FIRST DAY RELIEF

### I. Cash Management Motion

25. Pursuant to *Debtor's Emergency Motion for an Interim and Final Order Authorizing Continued Use of Existing (a) Cash Management System, (b) Accounts and Business Forms, and (c) Related Practices* ("**Cash Management Motion**"), the Debtor seeks an order authorizing it to (i) to maintain its existing bank accounts, and (ii) to continue to operate its Cash Management System[1] and related processes, ordinary course payments and receipts, and payment of any bank fees, in the ordinary course of business consistent with their pre-petition practices.

---

[1] All capitalized terms not otherwise defined in this Declaration shall have the meanings assigned to them in their respective Motions.

DECLARATION OF JOSEPH V. PEGNIA
IN SUPPORT OF FIRST DAY MOTIONS

8

26. As part of its Cash Management System, Debtor maintains, four (4) bank accounts with American National Bank of Texas (**"American National"**). Each Facility has a Deposit Account Control Agreement account (**"DACA Account"**), subject to Debtor's agreement with the Bond Trustee, where proceeds of their respective Accounts Receivables are deposited. Each Facility also has an operating account used for disbursing the respective Facility's Accounts Payable (the **"Operating Accounts"**) that are also subject to the Deposit Account Control Agreement. Together, the DACA Accounts and the Operating Accounts function as Debtor's Account System (the "**Accounts**" and together, the **"Account System"**).

27. Upon the filing of this Bankruptcy Case, the Debtor has instructed American National to refrain from making any payment on account of any prepetition obligations owed by Debtor without prior approval of Debtor. Such approval will only be given with respect to payments authorized by an order of this Court. Similarly, all automatic payments from the Operating Accounts have been canceled to avoid payment of prepetition obligations, and Debtor has instructed American National to not honor any prepetition checks that have not cleared as of the Petition Date.

28. Debtor maintains an integrated Cash Management System to collect, transfer and disburse funds generated by its operations. The Cash Management System is an important aspect of the Debtor's cash monitoring, budgeting and financial reporting functions, which are administered by the Debtor's third-party management company, Jasmine Estates of Oklahoma, LLC (**"Management Company"**) for ordinary course operations in its Facilities. The Cash Management System is similar to other cash management systems commonly employed by similar senior and memory care facilities.

DECLARATION OF JOSEPH V. PEGNIA
IN SUPPORT OF FIRST DAY MOTIONS

29. In the ordinary course of business, Debtor receives payments from private parties on behalf of its residents for the services Debtor provides to its residents, through the Management Company. All such payments are deposited into its DACA Accounts and tracked through the ALIS Software.

30. Historically, the Debtor has made substantially all payments out of its Operating Accounts including, without limitation, payments to vendors, payment of insurance premiums, payroll and other obligations pursuant to facility management agreements for employees[2], debt service payments (when the Debtor made those payments), taxes, and other obligations and expenses. Debtor uses QuickBooks software for paying its Account Payable Invoices and reconciling its accounting. To process its payroll payments, the Debtor uses a Professional Employment Organization ("**PEO**") advisor called Method HRM.

31. Debtor outsources its administrative, bookkeeping, and controller services through a third-party, Core Tax Now, which is operated by David Smith, CPA. Mr. Smith is well acquainted with the cash needs and financial obligations of the Debtor's business. Core Tax Now maintains Debtor's books and records relating to the Cash Management System in a manner that allows the Debtor to monitor and oversee transfers and transactions and gather account balance information. Such controls allow the Cash Management System to operate for the benefit of all parties in interest.

32. In the ordinary course of business, Debtor makes payments and collects receipts for payment for services provided to its residents via check, cash, wire transfer, automatic clearing

---

[2] The personnel operating both Facilities are co-employed by the Manager and a Professional Employer Organization, both of which are not affiliates of the Debtor.

DECLARATION OF JOSEPH V. PEGNIA
IN SUPPORT OF FIRST DAY MOTIONS

10

house payments (ACH), and credit card charges and receipts (including the payments described in this subsection, the "**Ordinary Course Payments and Receipts**").

33. Included in these Ordinary Course Payments and Receipts, Debtor pays its utilities and services providers, including its electric, gas, water, sewage, and trash provider. Prior to the Petition Date, payments to these utilities were automatically withdrawn from Debtor's Operating Accounts.

34. Historically, Debtor has not maintained a credit card. On certain occasions, vendors required payments for business expenses be made by credit card, or Debtor needed to purchase certain *de minimis* business expenses via credit card (the **"Credit Card Expenses"**). In these instances, the manager of the Management Company, James Denny of Imagine Senior Living, LLC, has used his personal credit card to pay the Credit Card Expenses. Such expenses are routinely submitted via an expense report submitted to Mr. David Smith. Through this Motion, Debtor also seeks approval to pay for the Credit Card Expenses through Mr. Denny's credit card, subject to its currently-existing procedures for the approval and reimbursement of such expenses. As part of its entrance to the bankruptcy process, the Debtor has stopped use of Mr. Denny's credit card pending order of this Court. As of the Petition Date, there are no outstanding prepetition amounts owed to Mr. Denny on his personal credit card, to the Debtor's knowledge.

35. I understand that one of the U.S. Trustee Guidelines in this jurisdiction requires a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts. The Debtor currently seeks a waiver of, among other things, the U.S. Trustee's requirement that the Bank Accounts be closed and new post-petition accounts be opened. Particularly at this point in these chapter 11 cases, this requirement would cause significant disruption in the Debtor's business and would impair their efforts to reorganize and facilitate a sale.

36. I submit that requiring the Debtor to adopt new cash management systems, open new bank accounts, and develop new practices with regard to account management, use of business forms, and its ordinary course payments and receipts, all as more fully described in the Cash Management Motion, at this early and critical stage of this chapter 11 case would impose a significant administrative burden and cause needless disruption. As a result, the Debtor requests authority to continue the use of the existing Accounts and Cash Management System.

37. I understand that prior to filing this case, the Debtor's counsel has contacted the U.S. Trustee to discuss the possibility of continuing the current accounts and systems in place on an agreed basis while allowing the Debtor and the U.S. Trustee to further discuss the Debtor's going-forward approach to their current cash management-related systems and practices. I understand that U.S. Trustee has agreed to allow the Debtor to continue to use its existing Accounts and systems, subject to American Nations converting such account to debtor in possession (DIP) accounts, or otherwise agreeing to meet the U.S. Trustee's requirements for DIP Accounts.

**II.** **Utilities Motion**

38. Pursuant to the *Debtor's Emergency Motion for an Interim and Final Order (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; and (ii) Determining Adequate Assurance of Payment for Future Services* ("**Utilities Motion**"), the Debtor seeks entry of an order (i) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (ii) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (iii) approving the Debtor's proposed offer of adequate assurance; and (iv) determining that

the Debtor is not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion.

39. In connection with the operation of its business, the Debtor utilizes various utility services, including, but not limited to, trash, natural gas, telephone, internet, electric, water, irrigation, waste, satellite television, and/or other similar services (the "**Utility Services**") from a number of utility companies or their brokers (the "**Utility Companies**"). Attached to the Utilities Motion as Exhibit A is a list of the Utility Companies that provide Utility Services to the Debtor as of the Petition Date (the "**Utility Service List**").

40. Historically, the Debtor has generally paid amounts owed to the Utility Companies on a timely basis. Moreover, to the best of its knowledge, there are no defaults or arrearages of any significance with respect to the Debtor's undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of this Chapter 11 case.

41. With the authorized use of the Cash Collateral and/or approved DIP Financing, the Debtor expects to have sufficient funds to pay all utility obligations with the Utility Companies post-petition as they become due, and I believe that the Debtor will timely pay for all post-petition utility services pursuant to the terms of the invoices and billing statements by the Utility Companies in the ordinary course of business using the Cash Collateral and DIP Financing.

42. The Debtor proposes to segregate on its books and records, within twenty (20) days of the Petition Date, $16,000.00 an amount greater than the estimated cost for two (2) weeks of Utility Services (i.e., approximately $15,075.00), calculated based on the historical data and estimates (the "**Deposit**") into one segregated bank account designated for the Deposit (the "**Utility Deposit Account**") for the benefit of all Utility Companies. The Utility Deposit Account will be held for the exclusive purpose of paying the Utility Companies for future bills. This

$16,000.00 Deposit amount will be sufficient to cover the approximately $15,075.00 in obligations that the Debtor incurs every two (2) weeks on average with the Utility Companies.

43. I believe that the Utility Deposit Account and the Debtor's ability to pay post-petition utility obligations as they come due in the ordinary course of business with the use of the Cash Collateral and DIP Financing shall meet the requirement of adequate assurance to the Utility Companies (the "**Proposed Payment Adequate Assurance**"). The Debtor proposes that the Deposit be maintained until the earlier of (a) entry of an order of the Court authorizing the return of any Deposit to the Debtor, (b) the effective date of a Chapter 11 plan in the Bankruptcy Case, or (c) the dismissal of the Bankruptcy Case.

44. In the event that the Debtor fails to timely pay for post-petition utility service per an invoice, the Debtor proposes that a Utility Company shall provide written notice of nonpayment (the "**Delinquency Notice**") and serve such notice on the Debtor, the proposed counsel to the Debtor, and counsel for the Bond Trustee, and counsel for the DIP Lender (defined below) (the "**Notice Parties**"). If the Debtor has not cured such non-payments and no Notice Party has objected to the Delinquency Notice within ten (10) business days of receipt of the Delinquency Notice, then the Debtor shall remit to the Utility Company from the Deposit the amount of post-petition charges claimed as delinquent in the Delinquency Notice. If the Debtor objects to the amount requested by a Utility Company in the Delinquency Notice, the Debtor shall, upon reasonable notice, calendar the matter (the "**Utility Payment Dispute**") for the next regularly scheduled omnibus hearing to determine the amount owed by Debtor to the Utility Company, if any. Pending resolution of any such Utility Payment Dispute, any such Utility Company shall be prohibited from altering, refusing, or discontinuing service to the Debtor. The Debtor has further proposed procedures by which the Utility Companies may requestt additional

adequate assurance of payment on a case-by-case basis (the "**Additional Adequate Assurance Procedures**") that I would submit are fair and adequate.

45. The Debtor intends to timely pay all post-petition obligations owed to the Utility Companies and expects that available funds will be more than sufficient to pay all such obligations. Based on the availability of funds to timely honor all post-petition obligations to the Utilities, it is my belief that the Utilities have adequate assurance of its future performance of the Debtor's obligations to the Utility Companies. Furthermore, I believe that the Utility Companies have adequate notice and the ability to object to the proposed adequate assurance under the Utilities Motion.

46. I believe the proposed adequate assurance of the Debtor's payment obligations to the Utilities is reasonable under the circumstances, and the Additional Adequate Assurance Procedures proposed in the Utilities Motion are fair and adequate. In addition, I submit that uninterrupted utility service is essential to the Debtor's ability to maintain its operations and provide services to its residents and therefore the emergency relief requested in the motion is necessary to prevent irreparable harm to the Debtor's business and its efforts to reorganize. Therefore, such relief is in the best interest of the Debtor's estate, its creditors, and other parties in interest.

**IV.    DIP Motion**

47. Pursuant to the *Debtor's Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtor to Obtain Postpetition Financing; (B) Authorizing Use of Cash Collateral; (C) Granting Adequate Protection to UMB Bank, N.A. as Indenture Trustee; and (D) Scheduling a Final Hearing* ("**DIP Motion**") the Debtor seeks an order authorizing the Debtor to obtain as senior secured super-priority term loan from a special purpose vehicle ("**DIP Lender**")

affiliated with Berkeley Alternative Income Fund I, LLC ("**BAIF**"), and authorizing the Debtor's use of cash collateral, and granting adequate protection to the Bond Trustee.

48. If the Debtor is not permitted to use enter into the DIP Facility and to use Cash Collateral, it may be forced to cease operations which would put its estate, its creditors and other parties in interest, including the Debtor's Residents, at peril. Ample cause exists for entry of the proposed DIP Order approving the Debtor's request to use Cash Collateral and enter into the DIP Facility. The Debtor needs to be able to use Cash Collateral and obtain post-petition financing; both are essential to the success of the Case and to the Residents who depend on the Debtors for personal and healthcare services. The requests for relief contained in the DIP and Cash Collateral Motion should be approved. They are essential to the Debtor's operations and will enhance the Debtors' ability to emerge successfully from this case.

49. I would therefore submit that an order granting the DIP Motion is necessary and in the best interests of the Debtor's estate, creditors, stakeholders and other parties in interest, and is necessary to avoid the irreparable harm that would occur to the Debtor and its Residents in the absence of such relief.

**V.    Application to Employ Omni Agent Solutions as Claims Agent**

50. Pursuant to the *Emergency Application of the Debtor for Entry of an Order Authorizing the Employment and Retention of Omni Agent Solutions A Claims, Noticing and Administrative Agent Nunc Pro Tunc to the Petition Date* (the "**Omni Retention Application**"), the Debtors seek authorization to retain Omni Agent Solutions ("**Omni**") as their claims, noticing and administrative agent ("**Claims, Noticing, and Administrative Agent**") with respect to this Case. Upon information and belief, Omni is an experienced claims and noticing agent and is frequently used by debtors in in a variety of chapter 11 cases across the country. I believe the

professionals at Omni are well qualified to provide such services, expertise, consultation, and assistance to the Debtor and serve as Claims, Noticing, and Administrative Agent in this Case. I believe Omni is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk of the Bankruptcy Court, or, in the alternative, the Debtor, of such burden. The employment of Omni will provide efficient management of the claims and noticing processes in this Case, thereby allowing the Debtor's Manager and its professionals to focus on the Debtor's reorganization efforts. Accordingly, I believe such experience, knowledge, and assistance will be valuable to the Debtor during this Case and therefore the Omni Retention Application should be approved.

[Remainder of the Page Intentionally Left Blank]

DECLARATION OF JOSEPH V. PEGNIA
IN SUPPORT OF FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of the filing under penalty of perjury.

                                                      /s/ *Joseph V. Pegnia*
                                                      Joseph V. Pegnia
                                                      Chief Restructuring Officer
                                                      Leading Life Senior Living, Inc.