Rachael L. Smiley (State Bar. No. 24066158)
Alex Campbell (State Bar No. 24095536)
Kevin Barnett (State Bar No. 24103834)
**FERGUSON BRASWELL FRASER KUBASTA PC**
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Phone: 972-378-9111
Fax:   972-378-9115
rsmiley@fbfk.law
acampbell@fbfk.law
kbarnett@fbfk.law

**PROPOSED COUNSEL FOR DEBTOR IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re** § § | | **Chapter 11** |
| **LEADING LIFE SENIOR LIVING, INC.,** § § § | | **Case No. 22-42784-MXM** |
| **Debtor.** § § § | | |

**DEBTOR'S EMERGENCY MOTION FOR AN ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) APPROVING BID PROCEDURES AND PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (III) APPROVING THE FORM AND MANNER OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

Leading Life Senior Living, Inc. ("**Debtor**"), files this *Emergency Motion for An Order (I) Approving the Sale of Substantially All of the Debtor's Assets; (II) Approving the Bid Procedures and Protections in Connection with the Sale of Substantially All of the Debtor's Assets; Approving the Form and Manner of Assumption and Assignment of Executory Contracts; and (IV) Granting Related Relief* (the "**Motion**"). In support of the Motion, the Debtor incorporates by reference the *Declaration of Joseph V. Pegnia in Support of First Day Motions and Applications*, dated November 18, 2022 [Docket No. 4] (the "**First Day Declaration**") and respectfully represents as

follows:

## PRELIMINARY STATEMENT

1. The Debtor is a not-for-profit Texas corporation that owns two memory care facilities (each a "**Facility**," together the "**Facilities**," and with all associated tangible and intangible property, the "**Assets**"). The first Facility, located in Edmond, Oklahoma, was opened in 2014 and has 42 beds. The other Facility, located in Oklahoma City, was opened in 2015 and has 44 beds. As of October 31, 2022, occupancy for the two Facilities, combined, was approximately 80%. The Facilities were acquired by the Debtor in 2017. To finance the acquisition of the Facilities, the Debtor issued $30,275,000 in Senior Living Revenue Bonds ("**Bonds**") through the Oklahoma Development Finance Authority (the "**Issuer**").

2. The Debtor is obligated to UMB Bank, N.A., solely in its capacity as trustee ("**Bond Trustee**") under the Indenture (as defined below) for the benefit of the beneficial holders of the Bonds authorized and issued by the Issuer pursuant to that certain Trust Indenture dated as of December 1, 2017 (as amended or supplemented from time to time, the "**Indenture**") by and between the Issuer and the Bond Trustee. As of the Petition Date, the amounts due and owing by the Debtor in connection with the Bonds and associated loan documents consists of an outstanding principal balance of $29,680,000.00, accrued and unpaid interest in the amount of $3,249,156.1, and unliquidated, accrued, and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date. Prior to the Petition Date, the Debtor had been operating under a forbearance agreement with the Bond Trustee since May 2, 2022.

3. The Debtor has suffered from liquidity issues owing to competition in the assisted living sector, the financial challenges related to the COVID-19 pandemic, and most recently, the mismanagement or diversion of funds by its prior manager. The largest known holder of the

Debtor's senior bonds, Berkeley Alternative Income Fund I, LLC ("**BAIF**"), has been actively engaged in supporting the continued viability of the Debtor's two Facilities. Prior to the Petition Date, BAIF provided $250,000 as part of a Liquidity Support Agreement to assist with operating expenses of the Facilities. In addition, the Debtor's board and BAIF entered into a non-disclosure agreement/access to non-public information agreement ("**NDA**") on June 24, 2022, under which BAIF was provided access to financial and operating data for the Debtor's Facilities. The NDA was originally to terminate on August 24, 2022, but was extended by the Debtor and BAIF to November 24, 2022. Under the NDA, BAIF was, and remains, prohibited from trading in the Debtor's bonds.

4. Following the extension of the NDA and extensive discussions with the Debtor and its board, it was determined by the Debtor and BAIF that it would be in the best interests of the Debtor's creditors and the Debtor's residents (whose welfare is closely intertwined with the Debtor's viability as a going concern) for the Debtor to seek chapter 11 protection, with a special purpose vehicle affiliated with BAIF serving as the Debtor in Possession lender ("**DIP Lender**") to support necessary operational expenses during and through the bankruptcy. BAIF also determined that as part of the bankruptcy, it would submit a stalking horse bid to purchase the Debtor's Assets, including the assumption of resident contract or leases.

5. On November 23, 2022, the Court entered its *Interim Order Approving the Debtor's Emergency Motion for Entry of Interim, and Final Orders (A) Authorizing the Debtor to Obtain Post-petition Financing; (B) Authorizing the Use of Cash Collateral;(C) Granting Adequate Protection to UMB Bank, N.A. as Indenture Trustee; and (D) Scheduling a Final Hearing* [Docket No. 37] (the "**Interim Dip Order**"), approving the Debtor's use of the DIP credit facility provided by the DIP Lender on an interim basis.

6. As of October 27, 2022, the Debtor retained GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("**B. Riley**"), to perform professional services including providing Joseph V. Pegnia as Chief Restructuring Officer ("**CRO**"), serving as the Debtor's financial advisor, and marketing the Debtor's assets for sale. The retention of B. Riley to serve in these capacities was approved by both the DIP Lender and the Bond Trustee.

7. Shortly after the Petition Date, the Debtor, along with its CRO and retained professionals, commenced negotiations with BAIF regarding terms for BAIF to serve as the stalking horse ("**Stalking Horse**") and submit a bid for the purchase of the Debtor's Assets.

8. The Debtor submits that the Bid Procedures (defined herein) as proposed in this Motion will provide for a sale process that maximizes the value of the Debtor's assets for the benefit of its creditors, parties in interest, and most importantly, for the benefit of its elderly residents. For the reasons set forth below, the Debtor respectfully requests that the Court enter an order, substantially in the form submitted with the Motion: (i) approving the sale of its Assets; (ii) approving the Bid Procedures and Bid Protections; and (iii) approving the proposed procedures for the assumption and assignment of executory contracts.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334(b). This Court can hear and determine this matter in accordance with 28 U.S.C. § 157 and the standing order of reference of bankruptcy cases and proceedings in this District. This matter is a core proceeding, and venue for this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

10. The bases for the relief requested in this Motion are 11 U.S.C. §§ 105, 363 and 365, and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

11. On November 18, 2022 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief in this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and commenced the above-captioned chapter 11 case (the "**Bankruptcy Case**").

12. The Debtor remains in possession of its property and is operating its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No examiner, trustee or official committee has been appointed in the Debtor's Bankruptcy Case as of the filing of this Motion.

13. A detailed description of the Debtor's business, capital structure, and the events leading to these chapter 11 cases is fully set forth in the First Day Declaration and is incorporated herein by reference.

14. Since the Petition Date B. Riley has been in contact with several parties to solicit interest in the assets. B. Riley is in the process of preparing a brief teaser and offering document summarizing the attributes of each facility and preparing a data room for parties to access. B. Riley will distribute the teaser and a draft confidentiality agreement to prospective purchasers and attempt to contact each by telephone to solicit their interest in the assets.

15. On December 2, 2022, the Debtor and the Stalking Horse agreed to the fundamental terms (the "**Stalking Horse Term Sheet**") (attached hereto as **Exhibit A**) for an asset purchase agreement ("**APA**")[1] for the Stalking Horse to purchase substantially all of the Debtor's Assets, subject to higher and better offers and the approval of the Court. The Debtor proposes to solicit additional qualified bids for the Debtor's Assets and, subject to the receipt of one or more qualified bids, hold an auction ("**Auction**") for the sale of the Assets among such qualified bidders. As

---

[1] The APA will be filed with Court separately, prior to the hearing on this Motion.

such, the Debtor's Assets will either be sold (including the assumption of resident contract or leases) pursuant to the terms of the APA with the Stalking Horse, or be sold to a qualified bidder for a higher and better bid at an Auction.

### A.  Proposed Bid Procedures

16. A copy of the Debtor's proposed bid procedures ("**Bid Procedures**") is attached hereto as **Exhibit B** and is summarized as follows:

17. <u>Due Diligence Participation</u>: Interested parties can conduct due diligence by contacting:

> B.  Riley Advisory Services
>
> Attn: Joseph V. Pegnia
>
> 3445 Peachtree Road, Suite 1225
>
> Atlanta, GA 30326
>
> jpegnia@brileyfin.com
>
> 470-346-6833

18. <u>Stalking Horse</u>: The Debtor has negotiated the Stalking Horse Term Sheet with the Stalking Horse for the purchase of the Debtor's Assets. The Stalking Horse has agreed to make the required cure payments with respect to any executory contracts it will assume. As a component of the Stalking Horse Term Sheet, the Stalking Horse is entitled to a break-up fee of 4% of the purchase price plus actual expenses in an amount not to exceed $200,000 incurred in connection with serving as the Stalking Horse hereunder (the "**Bid Protections**") if it is not the successful bidder for the Assets at the Auction.

19. <u>Bid Deadline</u>:  The deadline for any potential bidder to submit bids is _____, 20_ at 4:00 p.m. Central Standard Time (the "**Bid Deadline**"). For a bid to be

received on or before the Bid Deadline, it must be submitted to the following parties (collectively, the "**Notice Parties**"):

    a. Counsel for Debtor, Ferguson Braswell Fraser Kubasta PC, Attn: Rachael L. Smiley: rsmiley@fbfk.law

    b. Debtor's Chief Restructuring Officer, B. Riley Advisory Services, Attn: Joseph V. Pegnia: jpegnia@brileyfin.com

    c. Counsel for the Bond Trustee, Faegre Drinker Biddle & Reath LLP, Attn.: Laura E. Appleby: laura.appleby@faegredrinker.com; Vince Slusher; vince.slusher@faegredrinker.com; and Kristen Perry: kristen.perry@faegredrinker.com

    d. Counsel for the DIP Lender, Polsinelli PC: Attn: David Gordon: DGordon@Polsinelli.com; Mark Joachim: MJoachim@Polsinelli.com; Meredyth Kippes: mkippes@polsinelli.com; and Liz Boydston: LBoydston@Polsinelli.com

    e. The Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, TX 75242-1699; Attn: Elizabeth Young: Elizabeth.A.Young@usdoj.gov

20. To provide notice of the Auction and the opportunity to participate in due diligence, the Debtor, through B. Riley, proposes sending notice via email to the potential buyers that were initially contacted regarding the potential sale of the Assets. A copy of the proposed notice is attached to the Bid Procedures Order (the "**Auction and Sale Notice**"). The Debtor will send the Auction and Sale Notice to the potential investors, all creditors, and other parties of interest within two (2) business days following entry of the Bid Procedures Order. B. Riley will also seek to follow-up with each potential investor that previously executed an NDA.

**B.    Assumption and Assignment of Executory Contracts**

21. The Debtor also proposes to establish a procedure to allow for the identification,

assumption, and assignment of any executory contracts by the Successful Bidder(s).[2] For all executory contracts between the Debtor and third parties (excluding resident contracts and resident leases), the Debtor will file with the Court and serve on the Debtor's contract counterparty a notice setting forth the Debtor's calculation of the counterparty's cure amount, if any, that would be owing to the counterparty if the Debtor decided to assume or assume and assign the executory contract and informing the counterparty that its agreement may be assumed and assigned to the Successful Bidder(s) (the "**Cure and Possible Assumption and Assignment Notice**"). A copy of the proposed Cure and Possible Assumption and Assignment Notice is attached as **Exhibit C**. To object to the cure amount set forth in the Cure and Possible Assumption and Assignment Notice, the counterparty must file an objection explaining and providing support for why it disagrees with the cure amount (a "**Cure Objection**") with the Court within 14 days of the date of the notice and serve a copy of the objection on the Notice Parties.

22. If a counterparty does not timely file and serve a Cure Objection, that party will be forever barred from objecting to the Debtor's identified cure amount.

23. If the Debtor and the counterparty are unable to resolve the disputed cure amount or if there is another asserted Cure Objection, the Debtor's ability to assign the executory contract shall be decided at the hearing to consider approval of the sale of the assets ("**Sale Hearing**").

24. The Successful Bidder(s) will be responsible for paying all cure amounts required for the assumption and assignment of the executory contract in accordance with Bankruptcy Code Section 365.

25. The Debtor will hold all deposits made by Qualified Bidders in one or more

---

[2] All capitalized terms not otherwise defined in the Motion shall be given the meaning assigned to them under the Bid Procedures.

interest-bearing escrow account(s), but these deposits will not become property of the Debtor's estate absent order of the Court. The Debtor will return the deposits made by any Qualified Bidders that are not a Successful Bidder or Back-Up Bidder within three (3) business days of the entry of the Sale Order. The Debtor will return the deposits made by any Back-Up Bidders within three (3) business days after completing the sale with the Successful Bidder(s); however, if the Back-Up Bidder is determined to become a Successful Bidder(s) then their deposit will not be returned. The Debtor will also return any accrued interest on the deposits. The Successful Bidder(s)'s, and to the extent applicable the Back-Up Bidder's, deposits shall be credited towards the purchase price.

## RELIEF REQUESTED AND BASIS FOR RELIEF

26. The Debtor requests that the Court approve the sale of the Assets through an Auction and asset sale pursuant to the Bid Procedures, as it believes the sale and process is in the best interest of the Debtor's estate, its creditors, and its residents. The ability to sell the Assets free and clear will help generate interest in and bids on the Assets and maximize the return to the estate.

### A. The Proposed Bid Procedures Will Maximize the Value of the Debtor's Assets and are in the Best Interests of the Debtor's Estate and Should Be Approved

27. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Inst. Creditors of Cont'l Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the

sale.").

28. The paramount goal in any proposed sale of property of the estate is to maximize the value received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor]'s duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (internal citation omitted)).

29. Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates"). Where there is a court-approved auction process, the assets are presumed to sell for a full and fair price because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the

years as an effective means for producing an arm's length fair value transaction.").

30. The terms proposed under the Stalking Horse Term Sheet will ensure the Debtor receives the best attainable value for its Assets by establishing a floor value for the Assets and thereby avoiding low bids at the Auction. *See, e.g. Ogle v. Comcast Corp.*, 547 B.R. 717, 753 (Bankr. S.D. Tex. 2016); *see also In re Country Fresh Holdings Co.*, 2021 WL 2932680 at *10 (Bankr. S.D. Tex., July 12, 2021) ("Securing a bid above the Stalking Horse Bid is the epitome of 'maximizing recoveries for creditors.'")(internal quotation omitted).

31. The terms agreed upon in the Stalking Horse Term Sheet and the Bid Protections included in the Bid Procedures will also serve to attain the best possible value for the Debtor's Assets. The Stalking Horse Term Sheet resulted from a robust, arm's-length negotiating process with all parties represented by experienced counsel, and provides for a floor price for the Debtor's Assets acceptable to the Debtor. The Bid Procedures further provide for the Debtor to implement a diligent marketing and due-diligence process to identify interested and qualified bidders.

  **B.** **The Form and Manner of the Proposed Auction and Sale Notice Should be Approved**

32. Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21-days' notice of a hearing where the Debtor will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. Notice of this motion, the Bid Procedures, coupled with service of the Auction and Sale Notice, as provided for herein, is reasonably calculated to provide all interested parties with timely and proper notice of a potential Transaction, including the date, time, and place of the Auction (if one is held).

  **C.** **The Proposed Form and Notice for the Assumption and Assignment of the**

**Debtor's Executory Contracts in Connection with Sale Should be Approved**

33. Section 365 of the Bankruptcy Code permits a debtor, subject to the Court's approval, to assume an executory contract, provided that additional requirements are met if the debtor has defaulted under the contract, such as by curing or providing adequate assurance that the default will be cured. 11 U.S.C. § 365(a)-(b). Once the debtor assumes the contract, it can be assigned only if there is "adequate assurance of future performance by the assignee of such contract….whether or not there has been a default in such contract . . ." *Id.* § 365(f)(2).

34. Assignment of certain of the Debtor's contracts to the purchaser of its Assets is paramount to ensure the continuity of critical services for the care of the Debtor's residents. In connection with this process, the Debtor believes it is appropriate to establish certain procedures through which cure objections can be resolved and to resolve any objections to the assumption procedures. The Bid Procedures also incorporate the requirement that the default under an assumed contract must be cured as they require the Successful Bidder to cure the default under any assumed contracts pursuant to Section 365. The Bid Procedures also require any Potential Bidder to provide sufficient information and documentation that will enable the Debtor and interested parties to determine the bidder's ability to provide adequate assurance of future performance. The Debtor submits that the proposed form and notice of assumption and assignment of the Debtor's executory contracts is sufficient to meet the requirements of section 365 and should be approved.

**D.     The Sale of the Debtor's Assets Should be Approved**

35. The Court may approve a sale of property of the estate outside the ordinary course of business pursuant to Section 363(b)(1) after notice and a hearing. The Court should authorize a sale if the sale is supported by business justification, good business judgment, and sound business reasons. *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). In evaluating whether a sale meets this

standard, bankruptcy courts consider: (1) whether a sound business justification exists for the sale, (2) whether adequate and reasonable notice of the sale was given to interested parties, (3) whether the sale will produce a fair and reasonable price, and (4) whether the parties acted in good faith. Once the debtor has articulated a business justification, there is a "presumption that in making business decisions the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). As such, a bankruptcy court will approve a motion under Section 363(b) "unless it is shown that [the decision] is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, whim or caprice." *In re Aerovox, Inc.*, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (internal quotations omitted).

36. The proposed sale of the Debtor's Assets should be approved by the Court because it is supported by a business justification, will be adequately noticed, is calculated to produce a fair price, and is the product of robust, good-faith negotiations between the Debtor, the Stalking Horse Bidder, and the Bond Trustee. The Debtor and its board have consulted with the retained professionals at B. Riley and have undertaken substantial due diligence to determine the best path for the Debtor to insure the continued operation of its Facilities and the highest quality of care for its residents. Based on this extensive analysis, the Debtor has concluded that a sale of its Assets is the best option to achieve these aims.

37. The Debtor has proposed providing adequate and reasonable notice of the sale to interested parties. Additionally, the Auction and Sale Notice provided for in the Bid Procedures are reasonable and will provide all of the Debtor's known creditors and all other parties in interest with adequate and timely notice of, among other things, the Bid Procedures, Auction, and the Sale

Hearing. Furthermore, the Debtor has acted in good faith in determining the best way to maximize value for its creditors and its residents is through a sale of its Assets, and in proposing the related Auction and Bid Procedures. These good faith efforts also include the negotiations to enter into the Stalking Horse Term Sheet.

38. The Debtor further requests that the Court enter an Order authorizing the sale of the Assets free and clear of any and all liens, claims, interests, and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, whereby the Debtor may sell its Assets free and clear if one of the following is met:

   a. Applicable non-bankruptcy law permits the sale of such property free and clear of such interests;

   b. If the interest holder consents;

   c. Such interest is a lien and the price at which such property to be sold is greater than the value of all liens on such property;

   d. Such interest is in *bona fide* dispute; or

   e. Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39. Accordingly, the Debtor's Assets may be sold free and clear of any liens, claims, interests or encumbrances if at least one of the five foregoing conditions under section 363(f) is met. If any party holding a lien, claim, interest or encumbrance fails to object to the relief sought in this Motion, such party will be deemed to have consented to the sale of the Assets free of such lien, claim, interest or encumbrance. Such holder of a lien, claim, interest, or encumbrance will also have its interest attach to the proceeds received by the Debtor from the sale of the Assets. This further provides that the holder of any lien, claim, interest, or encumbrance will be adequately protected because the net sale proceeds will be applied to their respective liens. Accordingly, the Court

should provide in its order approving the sale that the sale of the Assets is free and clear of any and all liens, claims, interests, and encumbrances.

## EMERGENCY CONSIDERATION

40. Bankruptcy Rule 6003 empowers a Court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtor respectfully requests emergency consideration of this Motion. This Motion requests relief to establish proposed dates and deadlines with respect to the Debtor's sale process. The sale process must be commenced immediately in order for the Debtor to comply with the milestones established under the Court's Interim DIP Order. Failure to meet such milestones, including obtaining an order approving the Bid Procedures for the sale of the Debtor's Assets within 45 days of the Petition Date, and obtaining an order approving the sale of the Debtor's assets within 80 days of the Petition Date, could result in the Debtor losing access to its DIP facility and the use of cash collateral, which would be against the best interests of the Debtor's estate and the welfare of its residents. Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard in Bankruptcy Rule 6003 and requests that the Court approve the relief requested in the Motion on an emergency basis.

## NOTICE

41. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Northern District of Texas; (b) counsel for the Bond Trustee; (c) counsel for the DIP Lender; (d) the Oklahoma State Department of Health; (e) parties on the Debtor's creditor matrix; and (h) those parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor respectfully submits that such notice is sufficient and that no further notice of this Motion is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto: (i) approving the Bid Procedures, the Bid Protections, the assignment procedures, the proposed form of Auction and Sale Notice, proposed Cure and Possible Assumption and Assignment Notice and other notices referenced in this Motion, and related relief; (ii) following a subsequent hearing, an Order approving the sale of substantially all of the Debtor's Assets free and clear of any liens, claims, encumbrances, or interests; ang (iii) granting such other and further relief as the Court deems just and proper.

Respectfully submitted:  December 2, 2022

**FERGUSON BRASWELL**
**FRASER KUBASTA PC**

By: /s/ *Rachael L. Smiley*
Rachael L. Smiley (State Bar. No.24066158)
Alex Campbell (State Bar No. 24095536)
Kevin Barnett (State Bar No. 24103834)
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Phone: 972-378-9111
Fax:   972-378-9115
rsmiley@fbfk.law
acampbell@fbfk.law
kbarnett@fbfk.law

**PROPOSED COUNSEL FOR**
**DEBTOR IN POSSESSION**