Rachael L. Smiley (State Bar. No. 24066158)
Alex Campbell (State Bar No. 24095536)
Kevin Barnett (State Bar No. 24103834)
**FERGUSON BRASWELL FRASER KUBASTA PC**
2500 Dallas Parkway, Suite 600
Plano, TX 75093
Phone: 972-378-9111
Fax:    972-378-9115
rsmiley@fbfk.law
acampbell@fbfk.law
kbarnett@fbfk.law

**PROPOSED COUNSEL FOR DEBTOR IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re** § § | | **Chapter 11** |
| **LEADING LIFE SENIOR LIVING, INC.,** § § § | | **Case No. 22- 42784-MXM** |
| **Debtor.** § § § | | |

**DECLARATION OF JOSEPH V. PEGNIA, DEBTOR'S CHIEF RESTRUCTURING
OFFICER IN SUPPORT OF SECOND DAY MOTIONS**

I, Joseph V. Pegnia, declare as follows under the penalty of perjury:

1. My name is Joseph V. Pegnia, and I am over 21 years of age and competent to make this declaration ("**Declaration**").

2. I am the Chief Restructuring Officer ("**CRO**") of Leading Life Senior Living, Inc., a Texas nonprofit corporation (the "**Debtor**"), the debtor in the above-captioned chapter 11 case ("**Bankruptcy Case**"). I have formally served in this capacity since November 10, 2022.

3. I am a Managing Director at GlassRatner Advisory & Capital Group LLC dba B. Riley Advisory Services ("**B. Riley**"). I have over twenty-five years of professional experience in

DECLARATION IN SUPPORT OF SECOND-DAY MATTERS　　　　　　　　　　　　　　　　Page **1** of **11**

guiding restructuring alternatives, executing turnarounds, facilitating asset sales and otherwise providing financial guidance to companies in distress, and have been involved in over thirty Chapter 11 cases and multi-state Federal Receiverships. My experience crosses various industries, including healthcare, skilled nursing, financial services, and restaurant/hospitality. Some of my notable assignments as a turnaround consultant and/or CRO include the chapter 11 sale of a 600 resident CCRC, sale of a 100-bed skilled nursing facility, and the sale of a $150 million national mail-order pharmacy.

4. I submit this Declaration to assist the Court and other parties in interest in understanding the relief sought under certain "second day" matters for which the Debtor is seeking emergency relief. I have reviewed the factual support set forth in each of the second day pleadings and attest to the accuracy thereof to the best of my knowledge. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with the Debtor's professionals and its board of directors ("**Board**"), my review of relevant documents, or my opinion based on upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. Incorporated herein by reference is the *Declaration of Joseph V. Pegnia in Support of First Day Motions and Applications*, dated November 18, 2022 [Docket No. 4] (the "**First Day Declaration**"). Specifically, Paragraphs 6-16 of the First Day Declaration references the Debtor, the Acquisition of its Facilities, and Events Leading to Bankruptcy. Additionally, references to the Debtor's Prepetition Capital Structure can be found in paragraphs 17-24.

6. The following summarizes the relief requested with respect to, and support for, the Debtor's various second day motions and requests for related interim and final orders.

I.      **Sale Procedures Motion**

7.      Pursuant to *Debtor's Emergency Motion for an Order (I) Approving the Sale of Substantially all of the Debtor's Assets; (II) Approving Bid Procedures and Protections in Connection with the Sale of Substantially all of the Debtor's Assists; (III) Approving the Form and Manner of Assumption and Assignment of Executory Contracts; and (IV) Granting Related Relief* (**"Sale Procedures Motion"**) [Docket No. 54], the Debtor seeks an order approving the Bid Procedures[1], the Bid Protections, the assignment procedures, the proposed form of Auction and Sale Notice, proposed Cure and Possible Assumption and Assignment Notice; and approving the sale of substantially all of the Debtor's Assets free and clear of any liens, claims, encumbrances, or interests.

8.      Upon my review of the Debtor's records, it appears to me that the Debtor has suffered from liquidity issues owing to competition in the assisted living sector, the financial challenges related to the COVID-19 pandemic, and most recently, the mismanagement or diversion of funds by its prior manager.

9.      As of the Petition Date, I have been negotiating with the largest known holder of the Debtor's senior bonds, Berkeley Alternative Income Fund I, LLC (**"BAIF"**), regarding terms for and entity affiliated with BAIF to serve as the stalking horse (**"Stalking Horse"**) and submit a bid for the purchase of the Debtor's Assets.

10.     On December 2, 2022, the Debtor and the Stalking Horse agreed to the fundamental terms (the "**Stalking Horse Term Sheet**") for an asset purchase agreement ("**APA**") for the Stalking Horse to purchase substantially all of the Debtor's Assets, subject to higher and better

---

[1] All capitalized terms not otherwise defined in this Declaration shall have the meaning given to them under the applicable Motion that the testimony is given in support of.

offers and the approval of the Court. The Stalking Horse Term Sheet resulted from a robust, arm's-length negotiating process with all parties represented by experienced counsel and provides for a floor price for the Debtor's Assets that is acceptable to the Debtor.

11. I believe the Debtor has negotiated the Stalking Horse Term Sheet and the APA with the Stalking Horse for the purchase of the Debtor's Assets in good faith. The Stalking Horse has agreed to make the required cure payments with respect to any executory contracts it will assume. As a component of the Stalking Horse Term Sheet, the Stalking Horse is entitled to a break-up fee of 4% of the purchase price plus actual expenses in an amount not to exceed $200,000 incurred in connection with serving as the Stalking Horse hereunder (the "**Bid Protections**") if it is not the successful bidder for the Assets at the Auction. I believe the Bid Protections are reasonable and necessary under the circumstances to compensate the Stalking Horse for its out-of-pocket costs if it is not the successful bidder for the Debtor's Assets.

12. In addition to the APA, I believe the Debtor will solicit additional qualified bids for the Debtor's Assets and, subject to the receipt of one or more qualified bids, hold an auction ("**Auction**") for the sale of the Assets among such qualified bidders. As such, the Debtor's Assets will either be sold (including the assumption of resident contract or leases) pursuant to the terms of the APA with the Stalking Horse, or be sold to a qualified bidder for a higher and better bid at an Auction.

13. I submit that the best manner to accomplish the sale of the Debtor's Assts is through the Debtor's proposed bid procedures (**"Bid Procedures"**) attached as Exhibit B to the Sale Procedures Motion.

14. I further submit that the procedures set forth in the Bid Procedures accompanying the Sale Procedure Motion are in the best interest of all parties involved, as it will provide for a

sale process that maximizes the value of the Debtor's Assets for its creditors, parties in interest, and most importantly, for the benefit of its elderly residents.

15. I submit that the implementation of these procedures is supported by a business justification that is calculated to produce a fair price. This belief in due in part to the robust, good-faith negotiations between the Debtor, the Stalking Horse Bidder, and the Bond Trustee. B Riley and I have been retained to undertake substantial due diligence and determine the best path forward for the Debtor to ensure the continued operation of its Facilities and the highest quality of care for its residents, and based on this extensive analysis we have performed, conclude the sale of the Debtor's Assets is the best option to achieve these aims. This belief is also due in part to the Debtor's Board of Directors' agreement with the proposed sale of the Debtor's Assets.

16. Furthermore, it is my position and belief that the terms proposed under the Stalking Horse Term Sheet will ensure the Debtor receives the best attainable value for its Assets by establishing a floor value for the Assets and thereby avoiding low bids at the Auction. I believe these terms, along with the Bid Protections included in the Bid Procedures, will also serve to attain the best possible value for the Debtor's Assets.

17. It is also my position and belief that assignment of certain of the Debtor's contracts to the purchaser of its Assets is paramount to ensure the continuity of critical services for the care of the Debtor's residents. In connection with this process, it is appropriate to establish certain procedures through which cure objections can be resolved and to resolve any objections to the assumption procedures.

18. I would therefore submit that an order granting the Sale Procedures Motion on an emergency basis is necessary and in the best interests of the Debtor's estate, creditors, stakeholders and other parties in interest, and is necessary to avoid the irreparable harm that would occur to the

Debtor and its Residents in the absence of such relief.

## II. Insurance Motion

19. Pursuant to *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Prepetition Insurance Program; and (II) Pay any Prepetition Premiums and Related Obligations* [Docket No. 57] ("**Insurance Motion**"), the Debtor seeks an order authorizing it to (a) maintain the existing Insurance Program and pay all obligations arising thereunder, including any premium payments, (b) pay any and all obligations in connection therewith, including any additional fees or expenses that may arise, and (c) renew, revise, extend, supplement, change, or enter into new insurance policies as needed in the Debtor's business judgment; and (d) authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks issued and electronic payment requests made related to the foregoing.

20. The Debtor maintains or benefits from an insurance program to provide coverage for aspects of the Debtor's properties, operations, and related liability (the "**Insurance Program**"). Specifically, the Debtor's current management company, Jasmine Estates of Oklahoma, LLC ("**Management Company**") is the first named insured on a number of policies for which the Debtor is designated as an additional named insured (the "**Management Company Policies**").[2] I believe the Debtor benefits from the coverage obtained as an additional named insured under Management Company Policies. The Debtor is primarily responsible as the policyholder for

---

[2] The Debtor's Management Company is the first named insured on an Automobile Liability Policy; Package Policy (including Commercial General Liability, Commercial Crime, Medical Professional Liability Coverage, Commercial Property Coverage, Terrorism (General Liability), and Terrorism (Property)); and an Umbrella Policy (including Commercial Umbrella Coverage and Terrorism (Umbrella)). Accordingly, Management Company maintains primary rights and responsibilities for these policies; however, the Debtor is responsible for reimbursing the Management Company for such costs. The Debtor is an additional named insured under the Management Company Policies, sharing full coverage with Management Company but is not otherwise primarily responsible for the premiums for these policies.

premium payments for its Management Liability Insurance (the "**D&O Policy**" and together with the "Management Company Policies, the "**Insurance Program**").

21. On an annual basis, the Debtor is responsible for paying approximately $6,307.00 in premiums and related fees for the D&O Policy and reimburses the Management Company for the Debtor's costs associated with the Management Company Policies, which total approximately $175,421. The Debtor makes payments on the Management Company Policies on a monthly basis and pays the policy premiums on the D&O policy, quarterly/monthly, as they are assessed.

22. I submit that continuation of the Insurance Program is essential to the preservation of the value of the Debtor's business, property, and assets. In many cases, the coverage provided by the Policies is required by the regulations, laws, and contracts that govern the Debtor's business activities so that Debtor may carry out its obligations to care for its senior memory care residents.

23. The Debtor is current on all Premiums; however, certain of the Premiums require ongoing monthly or periodic payments. I submit that authorization to make payments under the Insurance Program is necessary because failure to pay such payments as they come due may harm the Debtor's estate in several ways. Specifically, I can identify a potential for an insurance company to terminate coverage. Such termination would leave the Debtor's assets unprotected from the loss in value that can result from casualties, natural disasters, or other unforeseen events. Should the Debtor's insurance coverage terminate, it would need to obtain replacement insurance and risk higher insurance costs and periods of being uninsured.

24. It is my understanding and belief that the Debtor needs to maintain insurance to responsibly operate its business and protect its assets, and that maintaining insurance coverage for the Debtor's assets is also a requirement of the Office of the United States Trustee. I maintain that it is in the best interests of the estate and all parties in interest to authorize the Debtor to maintain

the Insurance Program, including utilizing the services of any insurance agents or brokers that the Debtor employs in the ordinary course of maintaining the Insurance Program, and making the payments required by the Policies (or payments or reimbursements to the Management Company making payments on such Policies, as appropriate), and any necessary service or maintenance fees.

### III. Motion to Assume Management Contracts

25. Pursuant to *Debtor's Emergency Motion Authorizing the Assumption of Executory Contracts* [Docket No. 56] (**"Management Contracts Motion"**), the Debtor seeks an order authorizing it to assume the Management Agreements as provided under section 365 of the Bankruptcy Code.

26. On April 6, 2022, the Debtor entered into executory contracts ("**Management Agreements**") for the management of its Facilities with the Management Company. It is my belief that the Management Agreements are necessary, beneficial, and indeed, critical to the Debtor's business operations, and provide for ordinary course operations of the Facilities, including oversight of, and all tasks attendant to, the Facilities' day-to-day operations.

27. One of the Management Agreements is for management of the operations at the Debtor's Edmond Facility (the **"Edmond Management Agreement"**), and the other Management Agreement is for the operations at the Debtor's Southwest Oklahoma City Facility (the **"OKC Management Agreement"**). The Management Agreements are substantively identical in all respects.

28. Pursuant to the Management Agreements, the Management Company is to operate the Facilities in a safe, high quality, and well-maintained environment for their residents. The Management Company is required to prepare an annual budget for each facility for the Debtor's approval on an annual basis, as well as maintain proper bookkeeping and record keeping for the

Debtor's financial statements.

29. The Management Company oversees and co-employs (along with a third-party professional employment organization) the employees who operate the facility on a day to day basis, and is responsible for the hiring, training, supervision, promotion, and discharge of said employees. The Management Company is also responsible for entering into any contracts needed to furnish the Facilities with utilities, maintenance, payroll, human resources services, and other necessary professional services under the Management Agreements.

30. The Management Company is to be compensated monthly for the services provided in the Management Agreements (the **"Management Fee"**) in an amount equal to the greater of 6% of Collected Revenue[3] for that month or $9,000, plus an additional $2,500 per month for each facility, as further specified in the First Amendment to the respective Management Agreements.

31. The Debtor made all payments of the Management Fee to the Management Company timely until September 2022.

32. The Debtor is currently in arrears with respect to certain prepetition amounts comprising the Management Fee from September 2022 through the Petition Date. The Debtor currently owes the Management Company unpaid Management Fees and related reimbursements for expenses incurred on behalf of the Debtor, as follows:

| Fee/Expense | Details | Amount |
|---|---|---|
| Management Fee | September 2022 Edmond Management Fee | $9,520 |
| Management Fee | September 2022 SWOKC Management Fee | $9,401 |
| Management Fee | October 2022 Edmond Management Fee true-up | $365 |
| Management Fee | October 2022 SWOKC Management Fee true-up | $1,221 |
| Management Fee | November 2022 Edmond Management Fee | $12,494 |
| Management Fee | November 2022 SWOKC Management Fee | $13,527 |
| Management Fee | December 2022 Edmond Management Fee (prorated Nov. 1 – Nov. 17) | $7,217 |

---

[3] All capitalized terms not otherwise defined in this Declaration shall have the meanings defined in the Management Agreements.

| Management Fee | December 2022 SWOKC Management Fee (prorated Nov. 1 – Nov. 17) | $7,706 |
|---|---|---|
| Expense | Insurance (policy package and umbrella) | $14,587 |
| Expense | James Denny personal expense reimbursement – Edmond | $1,857 |
| Expense | James Denny personal expense reimbursement – SWOKC | $863 |
| Expense | Imagine Senior Living expense report | $1,686 |
| Expense | Imagine Senior Living expense report | $1,344 |
| | | |
| Total | | **$82,242** |

33. Accordingly, the amount required to cure the Management Agreements ("**Cure Amount**") is **$82,242.00.**

34. The Debtor's additional post-petition obligations for the Management Fee will continue to accrue monthly in accordance with the Management Agreements and will be no less than $11,500 per month per Management Agreement, but this amount could be greater should the Collected Revenue for the prospective month exceed $150,000.00.

35. I submit that assuming the Management Agreements is in the best interest of the Debtor, its estate, the Facilities, and, most importantly the Facilities' residents. I believe that, without the Management Company providing its critical services, including managing the Debtor's employees, coordinating logistical matters, working with the Facilities' vendors, and ensuring the overall health, safety and satisfaction of the Facilities' residents, the Debtor cannot continue to operate its business or provide care at the highest possible standards for its residents.

36. The Management Company is essentially the lifeblood of the Debtor's business operations. If the Management Company does not continue to provide its services, the Facilities will not function.

37. The Debtor can pay all Cure Amounts if it assumes the Management Contracts, which will compensate the Management Company for any actual pecuniary damages resulting from default. Future amounts owed to the Management Company under the Management

Agreements are included in the Budget, which I maintain will provide the Management Company with adequate assurance of future performance under the Management Agreements.

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of the filing under penalty of perjury.

                                                        /s/ *Joseph V. Pegnia*
                                                        Joseph V. Pegnia
                                                        Chief Restructuring Officer
                                                        Leading Life Senior Living, Inc.